FILED

2022 Apr-15  PM 12:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LEBRONTAY MOTTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:20-cv-396-AMM** |
| | ) | |
| **KOHLER CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION ON DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT**

This case is before the court on Defendant Kohler Co., Inc.'s Motion for Summary Judgment. Doc. 36. For the reasons explained below, the motion is **GRANTED**.

## I.      BACKGROUND

Facts set forth in the parties' statement of material undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. Doc. 21 at 18–19. These are the undisputed material facts construed in the light most favorable to Plaintiff Lebrontay Motton, and those disputed by Kohler but construed against it for purposes of its summary judgment motion:

The Kohler plant in Huntsville, Alabama, is a fiberglass bath and tub manufacturer that produces bathtubs, sinks, shower stalls, and shower walls. Doc.

37 ¶ 2; Doc. 39 at 5, 10 ¶ 3; Doc. 35-8 at 2. Kohler hired Mr. Motton as a Molding

Operator trainee on or about January 9, 2018. Doc. 37 ¶ 1; Doc. 39 at 5, 9 ¶ 1; Doc.

35-1 at 28. Mr. Motton was eventually promoted from trainee to a full-time Molding

Operator. Doc. 37 ¶ 3; Doc. 39 at 5; Doc. 35-1 at 29. During Mr. Motton's tenure,

Jim Bottomley, who is white, became the Area Supervisor where Mr. Motton

worked. Doc. 37 ¶ 9; Doc. 39 at 5, 9 ¶ 1; Doc. 35-1 at 31. Mr. Motton had little

interaction with Mr. Bottomley in his job as a Molding Operator. Doc. 37 ¶ 10; Doc.

39 at 5; Doc. 35-1 at 31.

After Mr. Motton began working at Kohler, he received the employee

handbook. Doc. 37 ¶ 11; Doc. 39 at 5; Doc. 35-1 at 29. That handbook contains

"Plant Rules" that provide "[a]ll associates are instructed to abide by the . . . rules[]"

and "[v]iolators are subject to discharge or lesser disciplinary action, depending

upon the seriousness of the offense, as determined by supervision." Doc. 37 ¶ 14;

Doc. 39 at 5; Doc. 35-6 at 6–7. The rules further provide that "[o]bscene, abusive,

harassing or threatening language or conduct, . . . [and] interference with fellow

associates, . . . cannot be tolerated[,]" and that "[i]nsubordination" (*i.e.*, "[w]hen

instructions are not followed") "result[s] [in] a decrease in the effectiveness of joint

effort and productivity." Doc. 37 ¶¶ 15–16; Doc. 39 at 5; Doc. 35-6 at 6–7. The

handbook also contains a "Job Performance Discipline Policy" that provides a four-

step disciplinary process: (1) "Instruction"; (2) "Reprimand #1"; (3) "Reprimand #2

and Suspension"; and (4) "Reprimand #3 and Suspension and/or Termination". Doc. 35-6 at 12; *see also* Doc. 39 at 10 ¶ 4; Doc. 35-5 at 8. The parties do not dispute that, "[p]ursuant to Kohler's policy, an employee is subject to discipline or termination upon receiving a third [job performance reprimand], depending on severity." Doc. 37 ¶ 21; Doc. 39 at 5, 10 ¶ 5.

In May 2019, Mr. Motton was injured in a motorcycle accident. Doc. 37 ¶ 38; Doc. 39 at 5, 11 ¶ 8; Doc. 35-1 at 38–39. Mr. Motton's mother informed Human Resources ("HR") Generalist, Claire Peterson, that Mr. Motton had been in the accident. Doc. 37 ¶ 49; Doc. 39 at 5, 11 ¶ 8. Mr. Bottomley did not receive a call from Mr. Motton during the period that he missed work following the accident. Doc. 37 ¶ 55; Doc. 39 at 5; Doc. 35-8 at 3. Nor did Mr. Bottomley receive notification from the HR department that Mr. Motton would be on leave. Doc. 37 ¶ 56; Doc. 39 at 5, 12 ¶ 2; Doc. 35-8 at 3. Because of Mr. Motton's absences in May and June of 2019, Mr. Bottomley submitted paperwork for a four-day suspension pending termination according to the company's no-call policy. Doc. 37 ¶ 57; Doc. 39 at 5, 12 ¶ 2; Doc. 35-8 at 4, 13. Mr. Motton's employment was not terminated pursuant to the no-call paperwork submitted by Mr. Bottomley. Doc. 37 ¶ 63; Doc. 39 at 5; Doc. 35-5 at 10; Doc. 35-8 at 13.

On June 12, 2019, Mr. Motton tried to return to work, but Mr. Bottomley told him that he had to leave until further notice. Doc. 37 ¶ 60; Doc. 39 at 5, 11 ¶ 1; Doc.

35-8 at 13. On June 13, 2019, Mr. Motton went to Kohler's HR office, where Ms. Peterson told Mr. Motton that he needed a doctor's excuse to return to work. Doc. 37 ¶¶ 64–65; Doc. 39 at 5, 12–13 ¶ 5; Doc. 35-1 at 48–49. Mr. Motton later submitted a physician release with a 20-pound restriction, but was told by HR that he needed a release allowing him to lift at least 25 pounds. Doc. 37 ¶¶ 68, 70; Doc. 39 at 5, 14 ¶ 6; Doc. 35-1 at 50; Doc. 35-4 at 8–9; Doc. 35-5 at 19. Mr. Motton responded by saying: "What are you guys doing here? What's the point of having you here?" Doc. 37 ¶¶ 70–71; Doc. 39 at 5; Doc. 35-5 at 19. According to Mr. Motton, he was "ask[ing] what . . . the purpose of the HR building [was] . . . [b]ecause of [his] lack of knowledge on the . . . inner workings between the floor employees, the supervisors and HR in situations such as [his] . . . that [he] was experiencing at the time." Doc. 35-1 at 48; Doc. 39 at 5 ¶ 72. According to Mr. Motton, he was not combative or argumentative during his interactions with HR. Doc. 39 at 7 ¶ 103; Doc. 35-1 at 49. Mr. Motton returned to HR to ask for the number for Kohler's ethics hotline, which was provided to him, and he filed a complaint. Doc. 37 ¶¶ 73–75; Doc. 39 at 5; Doc. 35-1 at 49; Doc. 35-9. Mr. Motton later submitted to HR another release allowing him to lift over 25 pounds, so he was cleared to return to work by HR. Doc. 37 ¶ 68; Doc. 39 at 5, 14 ¶ 6; Doc. 35-1 at 50; Doc. 35-4 at 9; Doc. 35-5 at 21.

On June 14, 2019, Mr. Motton attempted to return to work under the assumption that HR had sent Mr. Bottomley an email clearing Mr. Motton to return. Doc. 37 ¶¶ 76–77; Doc. 39 at 5, 15 ¶ 8; Doc. 35-1 at 50. Mr. Bottomley had not received anything from HR clearing Mr. Motton to return to work because HR failed to notify Mr. Bottomley. Doc. 37 ¶¶ 82–83; Doc. 39 at 5–6, 15 ¶ 8; Doc. 35-6 at 35; Doc. 35-7 at 14; Doc. 35-8 at 5. The parties dispute what was said during the June 14, 2019, interaction between Mr. Motton and Mr. Bottomley. According to Mr. Bottomley, when he told Mr. Motton that he had not received notice from HR, Mr. Motton told Mr. Bottomley "to check his Goddamn email." Doc. 37 ¶ 84; Doc. 35-8 at 5. Mr. Bottomley testified that he then told Mr. Motton that he had no email, and Mr. Motton responded that Mr. Bottomley "need[ed] to check that shit again." Doc. 37 ¶ 85; Doc. 35-8 at 5. According to Mr. Bottomley, Mr. Motton's tone was disrespectful. Doc. 37 ¶ 86; Doc. 35-8 at 6. According to Mr. Motton, Mr. Bottomley told him to "vacate the premises." Doc. 39 at 15 ¶ 9; Doc. 40 at 4 ¶ 9. According to Mr. Motton, he did not curse or say the things Mr. Bottomley claims he said, nor was he disrespectful. Doc. 37 ¶¶ 84–88; Doc. 39 at 6 ¶¶ 84–88; Doc. 35-1 at 50–52. The parties agree that Mr. Motton was frustrated. Doc. 37 ¶¶ 80, 89; Doc. 39 at 6, 15 ¶ 8; Doc. 35-1 at 51.

After this interaction, Mr. Motton turned and walked away from Mr. Bottomley to retrieve his belongings from where he stored them in an administrative

office where his mother worked. Doc. 37 ¶¶ 89–90; Doc. 39 at 6, 15 ¶ 9; Doc. 35-1 at 52. According to Mr. Bottomley, as Mr. Motton walked away, he called Mr. Motton's name three times, but Mr. Motton kept walking. Doc. 37 ¶¶ 91–92; Doc. 35-8 at 7. Mr. Bottomley testified that, after the third time he called Mr. Motton's name, Mr. Motton turned and said that he was "just going to get [his] stuff." Doc. 37 ¶ 92; Doc. 35-8 at 7. According to Mr. Motton, he was wearing ear protection and did not hear Mr. Bottomley say anything or call his name. Doc. 39 at 15 ¶ 9; Doc. 35-1 at 52; Doc. 35-7 at 118. The parties do not dispute that, at some point after Mr. Motton retrieved his belongings, he left the Kohler plant. Doc. 37 ¶¶ 89–90, 99; Doc. 39 at 5–6, 15 ¶ 9; Doc. 35-1 at 51–53.

That same day, Mr. Bottomley sent an email to Kohler's production manager, Seth Brickner, and HR manager, Nicky Faith, copying Plant Manager, Joe Bastow, regarding his interaction with Mr. Motton. Doc. 37 ¶ 100; Doc. 39 at 5–6; Doc. 35-7 at 13; Doc. 35-8 at 4, 14; Doc. 35-12 ¶ 3. The email provided that:

> Tonight at approximately 6:45 Mr. Motton came into the plant when I noticed him looking at the schedule I approached him and asked him what he needed he then stated that he was cleared to come back to work, I proceeded to tell him that I had not received any confirmation from HR[] that he was eligible to return[. H]e then said that he came up to HR this morning and had also been in phone contact to assure that all was ok, I explained to him again that I had not received anything[. A]fter that he responded with you better check your G- - D - - - email[. W]hen I explained I had already checked it he spouted maybe you should check that S - - - again, then he started walking through the plant[.] I [h]oll[e]r[e]d his name 3 times before he stopped and explained that he was being very disrespectful and that I was not going

to stand for it[. H]e then said let me get my stuff so I followed him thinking we were going to the lunch room when he turned down the [a]isle way towards warehouse I asked him where are you going he said I told you to get my stuff so I followed him[. C]ome to find out he keeps his belongings in his moms office by warehouse break room something I totally find wrong that an associate has access to an administrative office. Once he got his stuff I escorted him to the door.

If this gentleman is allowed to continue to work here he will need to transfer to either A or C shifts as I do not want him on my shift because since all this happened he will have bad work skills and it will only lead to more issues.

Doc. 39 at 15–16 ¶ 10; Doc. 40 at 4; Doc. 35-8 at 14. Mr. Motton "disputes the email's report that he had cursed and been disrespectful," and claims that he "only asked [Mr.] Bottomley if he'd checked his email." Doc. 39 at 6 ¶ 100, *id*. at 16 ¶ 11; *see also* Doc. 35-1 at 51.

Mr. Motton eventually was issued a job performance reprimand ("JPR") under Kohler's Job Performance Discipline Policy. Doc. 37 ¶ 113; Doc. 39 at 7–8, 16 ¶ 12; Doc. 35-7 at 17–18; Doc. 35-12 ¶ 10. The reprimand was dated June 14, 2019, indicates that it was his third reprimand, provides for "4 days suspension pending termination," and states that Mr. Motton "is being issued this reprimand . . . [f]or using inappropriate language while talking to a supervisor." Doc. 35-6 at 38. The JPR was signed by Justin Harris, the Union Steward, and Joe Bastow, the Plant Manager. *Id*.

On June 17, 2019, days after issuance of the third JPR, Mr. Bastow and Ms. Faith met with Mr. Motton to hear his side of the interaction with Mr. Bottomley.

Doc. 37 ¶ 105; Doc. 39 at 7 ¶ 105; *id*. at 19–20 ¶¶ 21, 23; Doc. 35-1 at 57–58; Doc. 35-5 at 23; Doc. 35-7 at 19. During that meeting, Mr. Motton denied cursing, but admitted he was frustrated and that he directed Mr. Bottomley to check his emails during the interaction on June 14, 2019. Doc. 37 ¶ 106; Doc. 39 at 7, 20 ¶ 23; Doc. 35-1 at 51; Doc. 35-7 at 19. Mr. Motton also identified two witnesses to the interaction with Mr. Bottomley: Angela Suggs, who was Mr. Motton's supervisor, and another employee named "Freddie". Doc. 37 ¶ 107; Doc. 39 at 7, 20 ¶ 23; Doc. 35-1 at 58; Doc. 35-7 at 20. According to Mr. Motton, Ms. Faith did not properly investigate Mr. Bottomley's report because she failed to speak with either of the two witnesses that Mr. Motton identified. Doc. 37 ¶ 107; Doc. 39 at 6 ¶ 102; Doc. 35-7 at 20.

As for Freddie, Ms. Faith emailed Mr. Bottomley to determine who Freddie was, but she could not recall whether Mr. Bottomley responded to that email. Doc. 39 at 8 ¶ 112; Doc. 35-6 at 37; Doc. 35-7 at 20. Ms. Faith did not recall whether she ever spoke to Freddie about the incident. Doc. 35-7 at 20–21; *see also* Doc. 37 ¶ 112; Doc. 39 at 8 ¶ 112. As for Ms. Suggs, Ms. Faith testified in her declaration that she "spoke with Angela Suggs who told [her] she did not see the beginning of the altercation but said she saw [Mr.] Bottomley following [Mr.] Motton through the plant continually calling his name," and that Ms. Suggs "said [Mr.] Motton was ignoring [Mr.] Bottomley and walking away quickly while mumbling under his

breath." Doc. 35-12 at 3 ¶ 9.[1] But, in her deposition, Ms. Faith testified that she could not recall whether she spoke to Ms. Suggs, and that it "could be the case" that she did not speak to Ms. Suggs because there were no statements from her on file. Doc. 35-7 at 20, 25–26; *see also* Doc. 40 at 6 ¶¶ 25–26. In an email to Mr. Bottomley dated June 17, 2019, Ms. Faith wrote that "Angela [Suggs] was not present for the initial discussion," but it is not clear from the email or deposition testimony whether Ms. Faith spoke to Ms. Suggs directly or received that information from Mr. Motton or someone else. Doc. 35-6 at 37; Doc. 35-7 at 25–27; *see also* Doc. 39 at 20 ¶ 24; Doc. 40 at 6 ¶ 25.

According to Kohler, Ms. Faith's decision to recommend Mr. Motton's third reprimand to Mr. Bastow and legal was, at least in part, based on "conversations with [Mr.] Bottomley." Doc. 37 ¶ 113; Doc. 35-7 at 15–18; Doc. 35-6 at 35. According to Mr. Motton, Mr. Bottomley's "recommendation was the basis for [Ms. Faith's] decision" to recommend Mr. Motton's third reprimand. Doc. 39 at 8 ¶ 113; *id.* at 16–17 ¶ 12; Doc. 35-7 at 14, 17–18, 23. Mr. Motton asserts that Mr. Bottomley participated in the termination decision, and he supports this assertion by quoting an email from Ms. Faith with the subject line "Lebrante Motton" that states: "Had an impromptu discussion with Seth [Brinckner] and Jimbo [Bottomley] in the hallway

---

[1] In his opposition, Mr. Motton moved to strike Paragraph 9 of Ms. Faith's declaration and the affidavit as a whole. Doc. 39 at 36–38.

this afternoon. They both support term. I will call and notify him tomorrow." Doc. 39 at 17–18 ¶ 16; Doc. 35-6 at 35. Kohler "admits" that Mr. Bottomley participated by "supporting the existing decision" to terminate Mr. Motton. Doc. 40 at 5 ¶ 16. The parties do not dispute that, at some point, "[b]oth legal and [Mr.] Bastow approved a third JPR and a discharge based on the third JPR, which [Mr.] Bastow issued for using inappropriate language to a supervisor." Doc. 37 ¶ 115; Doc. 39 at 8, 16 ¶ 12; *see also* Doc. 35-7 at 15–18, Doc. 35-6 at 35. The parties do not dispute that Ms. Faith told Mr. Motton that he was discharged during a phone call. Doc. 37 ¶ 131; Doc. 39 at 9, 21 ¶ 28; Doc. 40 at 6; Doc. 35-1 at 55; Doc. 35-7 at 15. The precise date of termination is unclear.

During his deposition, Mr. Motton testified that Mr. Bottomley "used racial terms toward people," such as "black people liking barbecue or chicken[,] or . . . black girls having big butts." Doc. 35-1 at 45. Mr. Motton also testified that some of the employees would "have certain handshakes" and Mr. Bottomley would say things like "Oh, why don't you guys . . . greet me like that? I want to be black too. I want to be cool, too." *Id*. Kohler disputes Mr. Motton's "allegation that [Mr.] Bottomley made racial comments at work," Doc. 40 at 6 ¶ 29, but the court will construe this disputed fact against Kohler for summary judgment purposes.

In his amended complaint, Mr. Motton alleges that he was "discriminated against . . . because of his African American race when [Kohler] terminated his

employment," and asserts race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Doc. 19 at 6. Mr. Motton also alleges that Kohler "interfered with [his] rights to benefits" under the Family Medical Leave Act, 29 U.S.C. §§ 2611 *et seq.* ("the FMLA") and "retaliate[ed] against [him] by terminating his employment for taking FMLA leave." *Id.* at 7. Mr. Motton voluntarily dismissed his FMLA claims, so the only claims that remain pending are his race discrimination claims. *See* Docs. 27 & 31.

## II.    STANDARD OF REVIEW

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks omitted). A material fact is in "genuine" dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks  omitted).  In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but  to  determine  whether  there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable

inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks omitted).

## III.   ANALYSIS

"Because the same analytical framework and proof requirements that apply to employment discrimination claims under Title VII also apply to discrimination claims under Section 1981," courts may, "for convenience, . . . consider . . . race-discrimination claims under the rubric of Title VII." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 n.6 (11th Cir. 2015) (citing *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011)); *see also Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) ("We examine claims of discrimination . . . under the same legal framework regardless of whether the plaintiff invokes section 1981 or section 2000e.").

Title VII provides that "[i]t shall be an unlawful employment practice for an employer (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule in her favor," and can do so in three ways. *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*." *Id.* "A plaintiff can also present direct evidence of discriminatory intent, . . . or demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id.* at 1220 n.6.

## A. Mr. Motton Has Not Provided Direct Evidence Of Discrimination

"Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact in issue without inference or presumption" and "is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (alterations accepted) (internal quotation marks omitted). "If an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Id.* Further, if the person who made discriminatory comments was not a decisionmaker with respect to the plaintiff's alleged adverse employment actions, then those comments are not direct evidence of a discriminatory motive. *See Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997).

Kohler asserts that Mr. Motton's complaint alleges that Mr. Bottomley "has a history of making racially offensive jokes and statement in the workplace evidencing a racial bias against African Americans." Doc. 37 at 26 (citing Doc. 19 ¶ 13). Further, Kohler asserts that Mr. Motton "claimed [Mr.] Bottomley said at unspecified times: (1) that black people like barbecue or chicken; (2) that black girls had big butts, and (3) that [Mr.] Bottomley asked, in reference to certain handshakes [Mr. Motton] had with some of his co-workers, 'why don't you greet me like that, I want to be black too. I want to be cool, too.'" Doc. 37 at 26 (citing Doc. 35-1 at 45). Kohler asserts that Mr. Bottomley "denies these comments," and that "it is undisputed that [Mr. Motton] has no evidence that [Mr.] Bottomley was a decisionmaker," but Kohler does not cite to any support for those assertions. Doc. 37 at 26. Kohler asserts that Mr. Bottomley's alleged remarks "do not show a retaliatory motive" and "are not the blatant remarks . . . that the Eleventh Circuit requires." *Id*. Kohler further asserts that, "[e]ven if these purported remarks showed discriminatory intent, [Mr. Motton] cannot connect the remarks to his discharge." *Id*.

Mr. Motton responds that "[t]he comments are not submitted as direct evidence of discrimination; rather, [Mr. Motton] relies on [Mr.] Bottomley's statements as circumstantial evidence of his discriminatory mindset." Doc. 39 at 24. Accordingly, Mr. Motton appears to admit that the alleged comments are not direct evidence of discrimination. *See id*.

14

## B. Mr. Motton Cannot Proceed Under The *McDonnell Douglas* Framework

"When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21. "If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id.* (alterations accepted) (internal quotation marks omitted).

To establish the fourth element of a *prima facie* case of discrimination, the plaintiff "must show that [they] and [their] comparators are 'similarly situated in all material respects.'" *Id.* at 1226. This standard must be applied "on a case-by-case basis, in the context of individual circumstances." *Lewis*, 918 F.3d at 1227. "Ordinarily, . . . a similarly situated comparator . . . will have engaged in the same basic conduct (or misconduct) as the plaintiff . . . ; will have been subject to the same

employment policy, guideline, or rule as the plaintiff . . . ; will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff . . . ; and will share the plaintiff's employment or disciplinary history . . . ." *Id*. at 1227–28 (citations omitted). It is not "necessary for a plaintiff to prove purely formal similarities—*e.g.*, that [they] and [their] comparators had precisely the same title[,] . . . [n]or will minor differences in job function disqualify a would-be comparator." *Id*. at 1227. Examples of "employees who are differently situated in material respects" include those "who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id*. at 1228 (internal quotation marks omitted). "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects' . . . ." *Id*.

Kohler asserts that, although Mr. Motton alleged that "[s]imilarly situated white employees have received lesser or no discipline for conduct similar to or worse than the alleged conduct that forms the articulated basis for [Mr. Motton's] termination," Doc. 19 ¶ 35, he "identified no similarly situated white employee who received more favorable treatment then he did in his EEOC Charge, in his Amended Complaint, or in his deposition testimony." Doc. 37 at 29–30 (emphasis omitted).

Mr. Motton responds that this case "does not fit strictly within the framework of the traditional *McDonnell Douglas* burden-shifting framework." Doc. 39 at 23.

16

Mr. Motton thus asserts that he "does not rely on establishing a traditional comparator prima facie case." *Id*. at 24. Because Mr. Motton does not proffer any similarly-situated comparators, he cannot survive summary judgment under the burden-shifting framework set out in *McDonnell Douglas*.

### C. Mr. Motton Failed To Present A Convincing Mosaic Of Circumstantial Evidence

"Aside from the *McDonnell Douglas* framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith*, 644 F.3d at 1328). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins*, 26 F.4th at 1250 (internal quotation marks omitted). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Id*. (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Mr. Motton argues that he has presented sufficient evidence to survive summary judgment, presumably under the convincing mosaic theory, because his

circumstantial evidence of discrimination includes: (1) the racial comments allegedly made by Mr. Bottomley, and (2) the allegedly false report made by Mr. Bottomley following the June 14, 2019 incident, which led to his termination. Specifically, Mr. Motton "relies on Jim Bottomley's repeated racially tinged 'jokes' mocking African Americans with offensive generalizations." Doc. 39 at 24; *see supra* at 7. Mr. Motton asserts that "such offensive generalizations or 'jokes' about African Americans in the mouth of a supervisor are prima facie evidence of his discriminatory mindset." *Id*. at 24–25. Further, Mr. Motton asserts that "a reasonable jury could believe [his] testimony that he did not curse and was not disrespectful, and thus conclude that [Mr.] Bottomley, in sending the email [on June 17, 2019], made a false report." *Id*. at 31. According to Mr. Motton, "[b]ased on [Mr.] Bottomley's history of making racially offensive 'jokes' and statements in the workplace, . . . a reasonable jury could reasonably infer from the falsity of [Mr.] Bottomley's accusation that [Mr. Motton cussed at him] that [Mr.] Bottomley is dissembling to cover up a discriminatory purpose." *Id*. (internal quotation marks omitted).

In support of that assertion, Mr. Motton cites various Eleventh Circuit cases, including *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998); and *Albert-*

*Aluya v. Burlington Coat Factory Warehouse Corp.*, 470 F. App'x 847 (11th Cir. 2012).

In *Hamilton*, the plaintiff taught at a Christian school, and "she and her then-fiancé conceived a child" before they "got married the next month." *Hamilton*, 680 F.3d at 1317. After they got married, the plaintiff met with the school's administrator and assistant administrator to inform them of her pregnancy and to ask for maternity leave. *Id*. "During that meeting, [the plaintiff] admitted that she had conceived the child before getting married." *Id*. A few days after that meeting, the school fired her "purportedly because she has sinned by engaging in premarital sex." *Id*. The plaintiff filed a lawsuit "asserting a claim of pregnancy discrimination under Title VII." *Id*. at 1318. After discovery, the district court granted the school's motion for summary judgment on the pregnancy discrimination claim, concluding that the plaintiff "had not established a prima facie case because she had not produced evidence of a nonpregnant comparator who was treated differently." *Id*.

On appeal, the Eleventh Circuit held that the district court erred in such conclusion. *Id*. at 1321. The court observed that the plaintiff "presented evidence that, in making the decision to fire her, [the school] was more concerned about her pregnancy and her request to take maternity leave than about her admission that she had premarital sex." *Id*. at 1320. Specifically, the plaintiff "testified at deposition that, after she told the [administrators] about her pregnancy but before she told them

she had conceived before getting married," one of the administrators "put his head back and he said, we feared something like this would happen" and "told her that she was going to have to take the year off because replacing a teacher taking maternity leave after the school year had started was hard to do." *Id.* (internal quotation marks omitted). The plaintiff "also testified that it appeared to her the [administrators'] primary concern was her request for maternity leave." *Id.* The court further observed that the plaintiff "also presented evidence vitiating the veracity of [the school's] purported reason for firing her—that she had premarital sex" because the plaintiff's testimony contradicted one of the administrator's testimony "that he had never heard her say she was sorry and that he would not have fired her if she had." *Id.* at 1320–21. Accordingly, the Eleventh Circuit held that the plaintiff "established a genuine issue of material fact about the reason that [the school] fired her" and that "[t]he ultimate issue [wa]s one for a jury to decide." *Id.* at 1321.

In *Ross*, the plaintiff "alleged that the defendant discriminated on the basis of race against [him] with respect to discharge, discipline, and other terms of employment[,] . . . [t]he trial judge denied [the defendant's] motion for summary judgment, and the case went to trial" where "the jury awarded [the plaintiff] $37,341.85 in back pay." 146 F.3d at 1288 (alterations accepted) (internal quotation marks omitted). On appeal, the Eleventh Circuit concluded that the plaintiff

"succeeded" in "present[ing] evidence which permitted the jury to reasonably disbelieve [the defendant's] proffered reason [for firing the plaintiff]." *Id*. at 1291.

The Eleventh Circuit found "[o]ne segment of [the plaintiff's] testimony especially compelling": the plaintiff testified that "the supervisor who was instrumental in [the defendant's] decision to fire [the plaintiff] for soliciting tips . . . had himself received tips." *Id*. The plaintiff also testified that, prior to his termination, the supervisor was speaking to another white man and "pointed to [the plaintiff] and said, 'You see that one over there, I am going to get rid of him.'" *Id*. The plaintiff asserted that the supervisor's "reference to 'that one over there' evinced racial animus by a decisionmaker who would ultimately fire him." *Id*. The plaintiff also testified that another decisionmaker "said 'I never seen as many blacks in this building except in a Tarzan movie.'" *Id*.

In holding that the trial court erred in "reject[ing] the Tarzan remark as an 'isolated general racial remark,' unable to aid [the plaintiff] in proving his case," the Eleventh Circuit held that, "[a]lthough . . . such comments are not *direct* evidence of discrimination . . . , we have not held that such comments can never constitute *circumstantial* evidence of discrimination." *Id*. (emphasis in original). The Eleventh Circuit held that "[b]ecause [the plaintiff's] case turned on circumstantial evidence, the proper inquiry is whether [the decision-makers'] . . . remark[s], when read in conjunction with the entire record, are circumstantial evidence of those

decisionmakers' discriminatory attitude." *Id*. at 1292. The court further held that, if the remarks constituted circumstantial evidence of the decisionmakers' discriminatory attitudes, "the court must then determine whether such circumstantial evidence, along with other evidence (including [the plaintiff's] prima facie case), might lead a reasonable jury to disbelieve [the defendant's] proffered reason for firing [the plaintiff]." *Id*.

The Eleventh Circuit "conclud[ed] that the[ decisionmakers'] comments, considered together with the fact that [the plaintiff's supervisor] had received tips, support[ed] the jury's rejecting [the defendant's] proffered explanation for firing [the plaintiff]." *Id*. The court held that "[b]ecause [the plaintiff] presented enough evidence from which the jury could find pretext, the jury's final, permissible inference as to the question of [the defendant's discriminatory] intent should [have] be[en] left undisturbed." *Id*.

In *Albert-Aluya*, the plaintiff sued the defendant "for violating Title VII . . . and [Section] 1981" asserting "four federal claims: (1) denial of equal protection under § 1981; (2) harassment and discrimination in violation of Title VII; (3) gender discrimination in violation of Title VII; and (4) retaliatory discharge in violation of § 1981 and Title VII." 470 F. App'x at 849. Following discovery, the defendants moved for summary judgment, and the magistrate judge "recommend[ed] that summary judgment be granted in favor of the defendants on all the federal claims."

*Id*. "The district court adopted the report and recommendation over the objections of [the plaintiff] . . . ." *Id*.

On appeal, the Eleventh Circuit held in an unpublished opinion that the plaintiff "established a prima facie case of discrimination," and that the defendant "responded to this prima facie case and offered legitimate, nondiscriminatory reasons for its action." *Id*. at 850–51. The Eleventh Circuit further held that "an employee may demonstrate pretext either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 851 (alterations accepted) (internal quotation marks omitted). The court held that an employee establishes pretext by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id*. (internal quotation marks omitted).

The Eleventh Circuit concluded that the plaintiff "presented enough evidence, when viewed in the light most favorable to her, such that a reasonable factfinder could find [the defendant's] proffered nondiscriminatory reason unworthy of credence." *Id*. The court held that, "[a]lthough [the defendant] contend[ed] that it fired [the plaintiff] because of her communication style and inaccuracies in her reports, there [wa]s evidence that two managerial-level . . . employees told [the

23

plaintiff] that she was being fired because of her thick African accent." *Id*. The court observed that "[c]omments about an accent may indicate discrimination based on one's national origin." *Id*. Further, the court concluded that the plaintiff "presented evidence that [the plaintiff's supervisor] often made derogatory comments about her African ethnicity and accent and told her that Africans were 'too brash.'" *Id*. The Eleventh Circuit thus held that, "[i]n light of [those comments] and the other circumstantial evidence, there [wa]s a genuine issue of material fact about whether the defendants' proffered reasons for firing [the plaintiff] were pretextual." *Id*.

In reply, Kohler asserts that *Ross* and *Albert-Aluya* "are distinguishable from the present case as those plaintiffs provided fairly strong additional evidence." Doc. 40 at 8 (internal quotation marks omitted). Kohler also asserts that, "[u]nlike here, the comments in *Albert-Aluya* . . . were related directly to the adverse decision." *Id*. at 8–9. Kohler asserts that Mr. Bottomley's "alleged comments undisputedly were not related to, or contemporaneous with, any employment decision." *Id*. at 8. Further, Kohler asserts that "[t]he Eleventh Circuit . . . ha[s] rejected an inference of discrimination for supervisor comments unrelated to an adverse action without more." *Id*. at 9.

Both *Ross* and *Albert-Aluya* are inapposite because they proceed under the burden-shifting framework for establishing discrimination, as opposed to the convincing mosaic framework. *See Ross*, 146 F.3d at 1290–92; *Albert-Aluya*, 470 F.

App'x at 850–51. Further, unlike the evidence in *Hamilton* that showed a link between the plaintiff's termination and the administrator's comments about her pregnancy and maternity leave, Mr. Motton's proffered evidence—that Mr. Bottomley, at some unspecified point, made racially motivated comments about Black people, and that Mr. Bottomley made a false report that lead to Mr. Motton's termination—does not establish a link between the racial comments and the false report or subsequent termination. Put differently, compared to the plaintiff's evidence in *Hamilton*, the evidence presented by Mr. Motton does not connect the discriminatory comments and the adverse employment action to support a finding that Mr. Motton has shown a convincing mosaic of racial discrimination.

Further, although neither party cited *Jenkins*, 26 F.4th 1243, that precedent is instructive. In *Jenkins*, the plaintiff, a white male, worked as a crane operator, and his supervisor was a Black male. *Id*. at 1246. In the summer of 2017, the plaintiff went to his supervisor to request weekend leave, but the supervisor denied his request "because another crane operator had already asked for the same time off." *Id*. The plaintiff "felt as if [his supervisor] was mistreating him" and feared that his supervisor "would retaliate against him if [he] went to Human Resources (HR)." *Id*. at 1247. "Nevertheless, it [wa]s undisputed that . . . [the plaintiff] made an appointment for the following day with an HR employee," but another HR employee informed the plaintiff's supervisor of the appointment. *Id*. Before the plaintiff's

appointment with HR, his supervisor asked to meet with him, and what happened in the meeting was disputed by the parties. *Id*. According to the plaintiff, the supervisor "confronted him because he went to HR" and "warned [the plaintiff] to have his facts straight before meeting with HR." *Id*. They "then started discussing [the plaintiff's] request for weekend leave" and, according to the plaintiff, his supervisor "became visibly upset and angry with wide eyes and quivering lips[,] . . . then stepped towards [the plaintiff]," so the plaintiff told his supervisor "to get out of his face and that he would not be intimated by [him]." *Id*. When the plaintiff "proceeded to walk out of the meeting, [his supervisor] told [him] to go home and then told his assistant managers to take [the plaintiff] off the schedule." *Id*. "After telling [the plaintiff] to meet at HR in the morning, [his supervisor] left the facility." *Id*. That evening, the supervisor emailed HR "and stated that [the plaintiff] was yelling, being disrespectful, and was aggressive." *Id*.

According to the plaintiff, "when he reported to HR the next morning, he learned that his appointment was canceled, the incident with [his supervisor] from the previous night was under review, and he was placed on administrative leave." *Id*. The parties did not dispute "that HR investigated and interviewed employees who were present on the day of the incident" and that the plaintiff "was not given an opportunity to present his side of the story to HR." *Id*. "HR drafted memoranda to support [the supervisor's] version of events that [the plaintiff] was yelling and

26

engaging in aggressive conduct." *Id*. at 1248. "Ultimately, HR fired [the plaintiff] for violating . . . [his employer's] Code of Conduct, but [the plaintiff] argue[d] that ground [wa]s pretext for [his supervisor's] true discriminatory reasons." *Id*. The plaintiff eventually filed a lawsuit against his supervisor, alleging that his supervisor discriminated against him based on his race. "The district court granted summary judgment to [the supervisor], finding that [the plaintiff] failed to present a prima facie case of race discrimination under either the *McDonnell Douglas* or convincing mosaic frameworks." *Id*.

The Eleventh Circuit held that the plaintiff "presented sufficient evidence to meet the convincing mosaic of discrimination standard at the summary judgment stage." *Id*. at 1251. The court observed that the plaintiff "argue[d] his mosaic include[d] circumstantial evidence that: (1) [his proffered comparator] committed a Rule A-6 violation (like [the plaintiff]) but remained employed; (2) no less than 18 white crane operators retired, resigned, or transferred from the department since [the supervisor] took over; (3) evidence that [the supervisor] mistreated three white crane operators; (4) [the supervisor's allegedly close] relationship with HR; (5) [the supervisor's] racially-biased comments about white crane operators; (6) [the plaintiff's] declining to change his accident report about a hard landing[, as was requested by his supervisor prior to the plaintiff requesting leave]; and (7) [the supervisor's] shifting reasons for terminating [the plaintiff]." *Id*. at 1250–51.

27

Further, the court observed that, although the proffered comparator "was not a strict comparator, the evidence that he threatened his supervisor, a Rule A-6 violation, and did not incur any additional warnings or discussion about his comments [wa]s relevant." *Id*. at 1251. The court observed that "there [we]re factual discrepancies between the white crane operator's testimony of why they left the department and [the supervisor's] explanation for why they left." *Id*. The court also observed that the supervisor "vigorously attempt[ed] to discredit the testimony of two black former . . . employees about [the supervisor's] comments in referring to white crane operators, including [the plaintiff], as racists, and social meetings of white crane operators as 'Klan meetings.'" *Id*. The court found that the supervisor's "racially-biased comments c[ould] be circumstantial evidence to support an inference of discrimination even if the comments were not made close to the termination decision" and that "[w]hether those comments allow[ed] an inference of discrimination turn[ed] on whether the jury believe[d the supervisor] or two former employees." *Id*. Accordingly, the Eleventh Circuit held that, "[c]onsidering all the evidence, [the plaintiff] provide[d] a convincing mosaic of discrimination, sufficient to survive summary judgment at this stage" and "ha[d] met his burden of showing factual disputes that should [have] be[en] decided by a jury—a jury whose role it is to weigh conflicting evidence and make any necessary credibility determinations." *Id*.

Like the *Jenkins* plaintiff, Mr. Motton and his supervisor, Mr. Bottomley, dispute what occurred during a meeting, after which Mr. Bottomley reported that Mr. Motton acted disrespectfully, and which disputed interaction ultimately led to Mr. Motton's termination. Unlike *Jenkins*, Mr. Motton did not show that employees outside of his protected class committed similar violations but remained employed, that numerous employees within his protected class left the department when Mr. Bottomley became supervisor, or that Mr. Bottomley or Kohler provided shifting reasons for Mr. Motton's termination. Rather, Mr. Motton proffered evidence that Mr. Bottomley made racially motivated comments about Black people, and that Mr. Bottomley submitted a false report regarding Mr. Motton's allegedly disrespectful actions, which report led to Mr. Motton's termination. The court is unaware of precedent that supports a finding that few, attenuated circumstances like those offered by Mr. Motton establish a convincing mosaic of racial discrimination.

Because of the difference between the circumstantial evidence of racial discrimination in this case and the evidence presented in the foregoing precedent, Mr. Motton did not establish a convincing mosaic of racial discrimination to survive summary judgment.

**D. Mr. Motton Cannot Establish A "Cat's Paw" Theory Of Liability**

"A plaintiff in a 'cat's paw' case typically seeks to hold the plaintiff's employer liable for the animus of a supervisor who was not charged with making the

ultimate adverse employment decision." *Brnovich v. Democratic Nat'l Comm*., 141 S. Ct. 2321, 2350 (2021) (alterations accepted) (internal quotation marks omitted).

The Eleventh Circuit "ha[s] previously stated the general proposition that in some cases, a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). But "this causation must be truly direct" and "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Id*. "One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory," which "theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Id*. at 1332. "In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers." *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id*. at 1332; *see also*

*Llampallas*, 163 F.3d at 1249 ("In effect, the harasser is the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the harasser's discriminatory animus.").

Mr. Motton asserts that this case "is a 'cat's paw' case" because he can "establish pretext by showing that [Kohler] relied on a false report from its manager, [Mr.] Bottomley, in terminating [Mr.] Motton, and that [Mr.] Bottomley's false report remained a causal factor in his firing." Doc. 39 at 27. In support of his assertion that "a reasonable jury could find that [Mr.] Bottomley used HR and management as a 'cat's paw' to bring about [Mr. Motton's] termination," Mr. Motton cites two cases: *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) and *King v. Volunteers of Am., N. Ala., Inc.*, 502 F. App'x 823 (11th Cir. 2012). *Id.* at 29 (emphasis omitted).

In *Staub*, the plaintiff sued his employer "under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, claiming that his discharge was motivated by hostility to his obligations as a military reservist." 562 U.S. at 415. "A jury found that [the plaintiff's] military status was a motivating factor in [the defendant's] decision to discharge him," but "[t]he Seventh Circuit reversed, holding that [the defendant] was entitled to judgment as a matter of law" because the plaintiff could not establish a "cat's paw" case. *Id.* (internal quotation marks omitted).

The Supreme Court first observed that the Uniformed Services Employment and Reemployment Rights Act "is very similar to Title VII." *Id*. at 417. The question on appeal was whether liability can be established "when the company official who makes the decision to take an adverse employment action . . . has no discriminatory animus but is influenced by previous company action that [wa]s the product of a like animus in someone else." *Id*. The Supreme Court held that "[t]he Seventh Circuit . . . erred in holding that [the defendant] was entitled to judgment as a matter of law" because "there was evidence that [the non-terminating employees'] actions were motivated by hostility toward [the plaintiffs'] military obligations[,] . . . that [the non-terminating employees'] actions were causal factors underlying [the terminating employee's] decision to fire [the plaintiff,] . . . [and] that both [the non-terminating employees] had the specific intent to cause [the plaintiff] to be terminated." Id. a 422–23.

In *King*, the plaintiff was terminated from her employment at "a Christian organization that, among other things, operate[d] group homes that serve[d] developmentally-challenged individuals in Florence, Alabama." 502 F. App'x at 824. The plaintiff's complaint alleged racial discrimination, retaliation, and hostile work environment claims. *Id*. at 826. The district court ultimately granted the defendant's motion for summary judgment on all of those claims. *Id*.

The Eleventh Circuit observed that the defendant "argue[d] that [the plaintiff] ha[d] failed to produce sufficient evidence of a causal link between her termination and [her supervisor's] discriminatory animus because she has not produced evidence that . . . the ultimate decision-maker . . . was [her supervisor's] 'cat's paw.'" *Id*. at 828. But the court disagreed and held that "the evidence that [the ultimate decision-maker] was [the plaintiff's supervisor's] cat's paw [wa]s sufficient under *Staub* to survive summary judgment." *Id*. at 828.

In support of that holding, the Eleventh Circuit concluded that: (1) the supervisor's statement "that she would engineer [the plaintiff's] termination and her statement to [the plaintiff] that [the ultimate decision-maker] rubber-stamp[ed] her recommendations present[ed] strong circumstantial evidence that she did in fact cause [the plaintiff's] termination"; (2) the plaintiff "presented evidence that all of the written reprimands were signed by [her supervisor] and some of them were not signed by anyone else, [which] . . . possibly indicat[ed the supervisor] was the motivating force behind them"; (3) it was "alarming that several of the reprimands cited in [the ultimate decision-maker's] letter informing [the plaintiff] of her termination occurred only because of some act by [the supervisor]"; and (4) the plaintiff "produced sufficient evidence to cast doubt on the veracity of [the defendant's] stated reason for its decision—the reprimands," as the supervisor's "state[ment that] she was going to get [the plaintiff] fired for complaining, coupled

with her outrageous, daily statements derogating African–American employees, create[d] a material dispute as to whether the stated reason, and not [the plaintiff's] race, was the real reason for the termination." *Id*. at 828–29.

Here, unlike in *Staub*, the evidence does not establish that Mr. Bottomley's actions were motivated by racial animus. *See supra* at 10–19. Further, here, unlike in *King*, the evidence does not show that Mr. Bottomley "made outrageous, daily statements derogating African–American employees," *King*, 502 F. App'x at 828–29, nor does it show that Mr. Bottomley made statements to other employees regarding his intent to get Mr. Motton fired for discriminatory reasons. Because the evidence does not establish that Mr. Bottomley's actions were motivated by racial animus, the cat's paw theory is inapplicable.

The Eleventh Circuit's decision in *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936 (11th Cir. 2010) is instructive. In *Williamson*, the plaintiff was under contract with a temporary staffing agency, which agency assigned him to "two separate hospitals where he worked as a temporary licensed practical nurse." *Id*. at 937–38. The plaintiff sued the two hospitals, the parent company of which the two hospitals were subsidiaries, and the temporary staffing agency, alleging that "he suffered race-based discrimination in employment." *Id*.

The Eleventh Circuit observed that the plaintiff argued that the temporary staffing agency was "liable for its role in the discrimination inflicted by [the two

hospitals] under a 'cat's paw' theory." *Id.* at 938. The Eleventh Circuit concluded that "the district court did not err in granting summary judgment in [the temporary staffing agency's] favor" because "[a]n application of the [cat's paw] theory could only be made . . . after it has been established that either . . . or both . . . [of the hospitals] discriminated against [the plaintiff]." *Id.* at 938–39. The Eleventh Circuit held that a finding that such a finding of discriminatory action "is the essence of a 'cat's paw' theory." *Id.* at 939. The Eleventh Circuit held that "[b]ecause [the plaintiff] failed to establish a *prima facie* case of racial discrimination against either [of the two hospitals], [the temporary staffing agency] was entitled to summary judgment on [the plaintiff's] 'cat's paw' theory." *Id.*

Here, like in *Williamson*, Mr. Motton failed to establish a prima facie case of racial discrimination against Mr. Bottomley. *See supra* at 6–19. Accordingly, Mr. Motton cannot establish liability under a "cat's paw" theory.

## IV.   CONCLUSION

For the foregoing reasons, the motion for summary judgment is **GRANTED**. Further, because the court's analysis does not rest on the testimony in Mr. Faith's declaration that is the subject of Mr. Motton's motion to strike, Doc. 39 at 36–38, that request is **DENIED AS MOOT**.

**DONE** and **ORDERED** this 15th day of April, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE